IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

CHARLES EDWARD GOODWIN                                        PETITIONER

VS.                     CASE NO. 5:17CV00182 DPM/PSH

WENDY KELLEY, Director of the
Arkansas Department of Correction                             RESPONDENT

**PROPOSED FINDINGS AND RECOMMENDATION**

**INSTRUCTIONS**

The following recommended disposition has been sent to United States District Judge D. P. Marshall Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court Clerk within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

**DISPOSITION**

Charles Edward Goodwin ("Goodwin") seeks a writ of habeas corpus pursuant to 28 U.S.C. §2254. Goodwin is currently in the custody of the Arkansas Department of Correction ("ADC") as a result of a 2007 Ouachita County jury trial, where he was found guilty of aggravated robbery and attempted capital felony murder. Goodwin, an habitual offender, was sentenced to life imprisonment. In his direct appeal, Goodwin raised three claims[1] for relief. *Goodwin v. State*, 373 Ark. 53 (2008). The Arkansas Supreme Court affirmed Goodwin's conviction. *Id.* Goodwin filed a timely Rule 37 petition with the trial court in June 2008, alleging three instances where his trial

---

[1] Goodwin argued there was insufficient evidence to demonstrate he intended to commit a theft, trial court error in denying his motion to suppress his statement, and trial court error in admitting photographs over his objection.

counsel was ineffective.[2] The trial court denied Rule 37 relief by Order dated December 2, 2011. Docket entry no. 10-4. Goodwin filed a notice of appeal but did not tender the record to the Arkansas Supreme Court in a timely fashion. As a result, on December 6, 2012, the Arkansas Supreme Court denied Goodwin's motion to proceed with his Rule 37 appeal. See docket entry no. 10-5, page 4 fn 1. In June 2015, Goodwin filed a petition to reinvest jurisdiction in the trial court to consider a writ of error coram nobis. The Arkansas Supreme Court denied this request in September 2015, noting the writ of error coram nobis to be an "extraordinarily rare[3] remedy," and finding no basis for coram nobis relief. Docket entry no. 10-5, page 1.

On July 10, 2017, Goodwin filed his federal habeas corpus petition, alleging the following claims for relief:

    1. He is actually innocent;

    2. He was denied the effective assistance of counsel at trial and on appeal;

    3. The trial court erred in admitting crime scene photographs and photographs of the victim into evidence over objections; and

    4. His attorney on appeal had a conflict of interest because he had also served as trial counsel.

Goodwin also filed an amended petition for habeas corpus relief on December 21, 2017. Although styled as an amended petition, it is more properly characterized as a further expansion of Goodwin's actual innocence assertion. He alleges his innocence to aggravated robbery because the prosecution did not prove he stole anything and did not produce a weapon. He claims aggravated robbery cannot be the predicate felony to support the charge of attempted capital murder. He cites

---

[2] Goodwin claimed ineffective assistance of counsel because his trial counsel did not challenge the voluntariness of his statements; did not challenge the basis of the attempted capital murder charge as defective and unsubstantiated; and failed to request a change of venue. Docket entry no. 10-4.

[3] The Arkansas Supreme Court recited the writ of error coram nobis was available only in four instances: (1) insanity at the time of the trial, (2) a coerced guilty plea, (3) material evidence withheld by the prosecutor, or (4) a third-party confession to the crime during the time between conviction and appeal.

faulty eyewitness and lineup identification[4] from the photo array shown to witnesses and from the trial. Finally, he alleges there was no DNA or blood evidence to connect him to the crimes.

Respondent Wendy Kelley ("Kelley") contends that the statute of limitations bars consideration of these claims, and also that claims 2 and 4 are procedurally defaulted. By Order dated September 26, 2017, Goodwin was notified of his opportunity to explain why the petition should not be dismissed. He has responded to the Court's Order. Docket entry no. 17. Before turning to the merits of the claims, we first consider if the petition is properly before the Court.

**Statute of Limitations:** Section 101 of 28 U.S.C. 2244 (as amended) imposes a one year limitations period on petitions for writ of habeas corpus:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Kelley contends that Goodwin should have filed his federal habeas petition on or before December 5, 2013, in order to comply with the timeliness provisions of 28 U.S.C. § 2244. Kelley

---

[4] For example, Goodwin alleges witnesses chose him out of a photo array of six people, and this identification is infirm because his photo was situated in the upper right hand corner, "a prominent location for suspects that law enforcement want identified. This is known as 'strategic placement.'" Docket entry no. 20, page 7.

calculates that Goodwin's Rule 37 petition, pending from June 4, 2008 through December 6, 2012, tolled the limitations period pursuant to 28 U.S.C. § 2244(2). Kelley also contends the limitations period is not otherwise tolled, either statutorily or equitably. The petition was filed more than three years after the limitations period began to run, according to Kelley. Thus, Kelley urges that Goodwin's failure to act sooner is fatal to the petition.

Goodwin concedes that his habeas corpus petition is not timely. However, he contends he can demonstrate "cause" for its untimeliness, and he claims his actual innocence overcomes the untimeliness. Docket entry no. 3, page 6. Goodwin, in his brief in support of his petition and in his response to the Court's Order of September 26, 2017, alleges the following as both cause for his untimely petition and as the basis for relief: (1) an inability to grasp the intricacies of habeas corpus litigation and a lack of discovery; (2) actual innocence under *McQuiggin v. Perkins*, 569 U.S. 383 (2013); and (3) actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995). We will consider these assertions and proceed to the merits of the various claims only if the limitations period allows such consideration. We note that the failure to file a timely petition can be excused under some circumstances:

> Equitable tolling is appropriate where extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time, or where a defendant's conduct lulls the prisoner into inaction. *Id.* The doctrine applies "only when some fault on the part of the defendant has caused a plaintiff to be late in filing, or when other circumstances, external to the plaintiff and not attributable to his actions, are responsible for the delay." *Flanders v. Graves,* 299 F.3d 974, 977 (8th Cir.2002). Equitable tolling is an "exceedingly narrow window of relief." *(Citation omitted).*

*Maghee v. Ault*, 410 F.3d 473, 476 (8th Cir. 2005).

Goodwin first claims that his failure to file a timely habeas corpus petition is due to an inability to grasp the niceties of habeas corpus law, and the lack of discovery. This assertion is accompanied by few facts, and no case law is cited.[5] This assertion of lack of legal knowledge is

---

[5] The Court is aware that lack of education has been alleged as "cause" for procedural default. In *Smittie v. Lockhart*, 843 F.2d 295 (8th Cir. l988), the Court found a petitioner's *pro se* status and ninth grade education were not sufficient to demonstrate cause for failing to pursue state court remedies.

4

contained on page 6 of a 123 page brief Goodwin filed in support of his petition. This petition is thorough, supported with legal arguments and numerous citations, demonstrating an ability to express his habeas corpus claims and related arguments. The record before us does not establish lack of legal knowledge as a reason to equitably toll the limitations period, and we find this assertion to be lacking. Similarly, the absence of discovery does not toll the limitations period. This lack of discovery will be discussed later in connection with his actual innocence claims. For now, it is sufficient to state that Goodwin fails to link the lack of discovery with his inability to file a timely petition.

Goodwin next argues that the limitation period should be tolled because of his actual innocence. He further contends his actual innocence warrants habeas relief. Goodwin embraces *McQuiggin v. Perkins*, 569 U.S. 383 (2013), which held that actual innocence, if proved, may serve as a gateway through which the petitioner may pass to overcome the expiration of the statute of limitations. The Supreme Court emphasized, however, that a tenable actual innocence gateway plea is rare. To advance a tenable claim, the petitioner must meet the standard set forth by the Supreme Court in an earlier case:

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

*Schlup v. Delo*, 513 U.S. 298, 324 (1995). Since *McQuiggin* cites the *Schlup* standard, Goodwin must demonstrate actual innocence under *Schlup* in order to overcome the limitation barrier. Absent such a showing, the merits of his claims are not properly before this Court. The Court, in *Schlup*, sets the standard required of Goodwin; he "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." 513 U.S. at 327.

With this standard in mind, we turn to Goodwin's actual innocence assertions. According to Goodwin, his actual innocence could be demonstrated via phone records which would prove he was on a land line at the time the aggravated robbery and attempted capital murder occurred in

Bearden, Arkansas, on June 7, 2006. He claims the phone records would exonerate him by proving that he was talking with the mother of his daughter at 10:30 to 10:45 for "roughly 15 minutes" on the date in question. Docket entry no. 3, pages 10, 31. According to Goodwin, these phone records, coupled with the fact that he was never identified as the perpetrator, would have changed the outcome of the trial. To properly evaluate this alibi, it is helpful to examine the opinion of the Arkansas Supreme Court on direct appeal, the trial record, and the alibi testimony Goodwin offered at his trial.

> The Arkansas Supreme Court ably described the facts presented at trial:
>
> The facts in this case are gleaned from witnesses at trial and Goodwin's statement to police officers. At approximately 10:15 a.m. on June 7, 2006, Betty Word, the owner of the Fashion Center in Bearden, was working at the store when a longtime customer, Rosetta Milton, came in and paid forty dollars towards her account. While Mrs. Milton was looking at dresses, a thin black man dressed in dark clothes, wrap-around sunglasses, and a Nike headband came into the store and began shopping. Both Mrs. Word and Mrs. Milton identified this man as Goodwin. After Mrs. Milton left the store, Goodwin continued shopping and asked Mrs. Word several questions about her merchandise. He then asked Mrs. Word whether she knew who he was, to which she responded that he was Virginia Marshall's son. They continued to chat for a few minutes. She then turned around and began putting shoes on a shelf.
>
> Goodwin approached Mrs. Word with one hand behind his back and said, "This is a robbery." Mrs. Word offered to get him as much money as he wanted, but he said that, since she knew who he was, he would have to kill her. He took her into a back room and started strangling her. When she continued to struggle, he tried to suffocate her with plastic bags. Eventually, he struck her three times on the head with an unidentified object. Thinking she had been shot, she fell to the floor, bleeding, and pretended to be dead.
>
> Goodwin left the back room but came back later and kicked Mrs. Word. She remained motionless, and he checked her pockets. He then left the store. Law enforcement officers from the Ouachita County Sheriff's Department and the Arkansas State Police, as well as the Bearden City Marshall, responded to the scene after Mrs. Word was discovered by a friend who worked at a nearby store. Mrs. Word was conscious when the police officers arrived. Although she did not know Goodwin's real name and expressed some confusion as to his nickname, she identified her attacker as Virginia Marshall's tall, slender son. The forty dollars paid by Mrs. Milton and all of the quarters from the cash register were missing. Goodwin was arrested by police officers that afternoon. He was wearing dark clothes and had a Nike headband in his pocket. Both Mrs. Word and Mrs. Milton later identified Goodwin in a photo array prepared by police officers.
>
> After his arrest, Goodwin made a videotaped statement to police officers, in

> which he said that he had gone to a drug dealer on the morning of the robbery and had gotten some crack cocaine. He stated that, after smoking the cocaine, he began to consider how he was going to get money to buy some more. He admitted to going into the Fashion Center and talking to Mrs. Word, eventually telling her that he was going to rob her. He stated that she told him she did not have much money at the store but would take him to the bank. He also admitted taking her into the back room and pushing her hard before taking money from the cash register.
>
> Defense witnesses, however, had a different version of the events of June 7, 2006. Goodwin's sister and her twelve-year-old son testified that they were with Goodwin at his stepfather's house between 11:00 a.m. and 12:30 p.m. on the day of the robbery. Goodwin also testified in his own defense to the effect that he was awakened at around 10:30 or 10:45 a.m. on the day of the robbery by his mother, because he had a phone call from his wife. According to Goodwin's version of events, after talking to his wife for about ten minutes, he left the house and got crack cocaine from local drug dealers. He stated that, after obtaining the drugs, he returned to his stepfather's house at 11:00 a.m. and smoked crack on the back porch. At around 12:30 or 1:00 p.m., he testified, he left the house for a while. He further testified that, when he returned to the house, his sister told him that people were saying that he had shot Mrs. Word, and he fled before being arrested. Goodwin also testified that the only reason that he made an incriminating statement on the day of the robbery was that police had coerced him and threatened him with violence.

*Goodwin v. State*, 373 Ark. 53, 55–56 (2008).

We have carefully reviewed the trial transcript, which provides additional information about the timing of the crime. Betty Word, the victim of the crime, estimated the robbery started at 10:30 or later. Docket entry no. 18-2, page 26. Rosetta Milton, the shopper at the store who identified Goodwin from a photo array,[6] stated she arrived around 10 and stayed in the store for around 20 minutes. Docket entry no. 18-2, pages 31-32. Ann Scrab testified she found Betty Word near noon, and Joe Strickland, a deputy at the Ouachita County Sheriff's Department, stated the 911 call from Ann Scrab was received at 11:53. Docket entry no. 18-2, pages 40, 49. The trial testimony as to the precise time of the crimes was, with the exception of the time of the 911 call, expressed in estimates and approximations. The prosecution did not attempt to prove the hour and minute the crime occurred, other than the evidence showed the events started

---

[6] Rosetta Milton and Betty Word clearly identified Goodwin from a photo array, and testified to his identity without equivocation at trial. Thus, Goodwin's assertion that he was never identified as the perpetrator is without a factual basis.

around 10 and concluded some time before the 11:53 911 call.  As a result, even if we were to generously assume Goodwin could produce telephone records to show a phone call[7] to his daughter's mother from 10:30 to 10:45 on June 7, 2006, this would not demonstrate actual innocence.  This is so for at least three reasons.

    First, Goodwin testified at trial that he was awakened by his mother on June 7, 2006, at 10:30 or 10:45, with a phone call from his wife.  He stated he talked with his wife for about 10 minutes, telling her he would call her shortly after he went to his aunt's house.  He did not call her back, according to the trial transcript.  Docket entry no. 18-2, pages 99-100.  The *Schlup* standard which Goodwin must satisfy calls for "new" evidence.  The alleged alibi evidence Goodwin now offers is not new.  Rather, it is simply a slight variation on the testimony he gave at trial.

    Second, the *Schlup* Court emphasized that the new evidence must be reliable.  Goodwin's purported alibi evidence is far from reliable.  Essentially, Goodwin asks the Court to believe him and disbelieve the eyewitnesses and ample physical evidence adduced at trial.  This is the same proposition he offered the jurors at trial.  They declined to believe the alibi testimony of Goodwin, his sister, and his nephew, when weighed against the other evidence.  The version of the alibi now presented by Goodwin differs only slightly from the version previously rejected. The new version is not reliable, as required by *Schlup*.

    Finally, the alibi evidence now urged by Goodwin is not of the type which would satisfy the *Schlup* standard.  The Court provided examples of the type of new, reliable evidence which might meet the standard: exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial.  Goodwin's current alibi evidence fits into none of the above categories.

---

    [7]Assuming the existence of phone records showing a call to the land line, Goodwin does not suggest how he would prove that he was actually on the call, other than his self-serving statement.

Goodwin misconstrues the weight to be given to his "new" alibi. New assertions such as this do not exonerate a petitioner such as Goodwin, who simply offers a repackaged version of an alibi offered at trial. Goodwin falls far short of demonstrating actual innocence as envisioned by the *Schlup* Court. As a result, Goodwin fails to construct a pathway to defeating the limitations period.

In his amended petition, Goodwin offers additional arguments of actual innocence. None of these arguments can satisfy the *Schlup* standard, as Goodwin points to no new evidence, much less any new reliable, scientific evidence as the basis for his innocence. Instead of new evidence, Goodwin offers only legal arguments, such as the failure to prove the elements of the crimes for which he was convicted, or his view on the evidence which was presented at trial. This lack of new evidence is fatal to Goodwin's claim of actual innocence as presented in the amended petition.

In summary, to be timely, Goodwin should have filed his federal habeas petition on or before December 5, 2013. His claims of unfamiliarity with the law and of actual innocence are without merit and do not toll the limitations period. As a result, we recommend the petition be dismissed as untimely.[8]

Pursuant to 28 U.S.C. § 2253 and Rule 11 of the Rules Governing Section 2554 Cases in the United States District Court, the Court must determine whether to issue a certificate of appealability in the final order. In § 2254 cases, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). The Court finds no issue on which petitioner has made a substantial showing of a denial of a constitutional right. Thus, we recommend the certificate of appealability be denied.

---

[8]We need not, and do not, consider the procedural default argument under the circumstances in this case, where the limitations period has long since expired.

IT IS SO ORDERED this 14th day of February, 2018.

_____
UNITED STATES MAGISTRATE JUDGE